UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

CONFEDERATED TRIBES OF THE
COLVILLE RESERVATION, a
federally recognized Indian
tribe; and C. VERNON JOHNSON,

                    Plaintiffs,

        v.

PHIL ANDERSON, Director of
the Washington department of
Fish and Wildlife, in his
official capacity; and BRUCE
BJORK, Chief of the
Washington Department of Fish
and Wildlife Enforcement
Program, in his official
capacity,

                    Defendants.

NO. CV-09-0342-EFS

**ORDER GRANTING AND DENYING IN
PART DEFENDANTS' MOTION TO
DISMISS PLAINTIFFS' § 1983
CLAIMS**

    The parties ask the Court to wrestle with an age-old issue: the struggle between two sovereigns asserting their respective rights to protect the safety and interests of those for whom they are responsible. The state of Washington[1] asserts its right to enforce hunting laws

_____

    [1]  For ease of reference, the Court hereafter refers to Defendants collectively as the "State" where appropriate.  Defendant Phil Anderson is the current Director of the Washington Department of Fish and Wildlife

ORDER * 1

against members of the Colville Indian Tribe ("Tribe"), who are hunting off the reservation but on lands on which tribal members enjoy "in common" treaty-hunting rights.[2] Although numerous appellate and district courts have discussed the interplay between a state's and a tribe's responsibilities as they relate to wildlife *conservation* to which they enjoy "in common" rights, no appellate court has focused on this interplay as it relates to hunting *safety*. The Court herein is tasked with the responsibility of setting forth a legal standard with which to assess the State's hunting safety laws, as well as resolving challenging issues relating to Plaintiffs' 42 U.S.C. § 1983 claims.

## I. Background[3]

On November 17, 2007, a Washington Department of Fish and Wildlife (WDFW) enforcement officer stopped Plaintiff C. Vernon Johnson, who is an enrolled member of the Tribe,[4] and cited him for possessing a rifle in

_____

(WDFW) and oversees the enforcement of State hunting laws. Defendant Bruce Bjork is WDFW's Assistant Director and Chief of WDFW's Enforcement Program.

[2] Hereinafter, the Court simply refers to off reservation "in common" treaty-hunting right as "in common" hunting right.

[3] The facts are largely undisputed. This background is based primarily on the parties' Joint Statement of Uncontroverted Facts (ECF No. 52).

[4] The Tribe is a federally-recognized Indian tribe composed of twelve aboriginal tribes that traditionally occupied large parts of the

a motor vehicle with a round in the magazine in violation of state law, RCW 77.15.460(1).  Based on this citation, Mr. Johnson was prosecuted in Stevens County District Court.   Mr. Johnson pled guilty to the misdemeanor charge; the state court imposed a $100 fine, including court costs, and a twelve-month deferred sentence.  Mr. Johnson did not appeal his conviction or sentence.  His deferred twelve-month sentence expired with no violations.  Not raised during the state criminal proceeding was whether the State lacked the authority to convict and sentence Mr. Johnson because the 1891 Agreement between the United States and the Tribe allows Mr. Johnson to enjoy "in common" hunting rights in the location he was cited: the north half of the Colville Reservation ("North Half").[5]

---

interior Columbia River basin.

[5]  In the 1891 Agreement, the Tribe agreed to public settlement of certain lands within the North Half.   The North Half encompasses approximately 1.5 million acres, which is mostly undeveloped, sparsely populated land between the Okanogan and Columbia Rivers.   The largest population centers in the North Half are Tonasket, located on the Okanogan River, and Republic, in the south central part of the North Half, each of which has approximately 1,000 residents.  The North Half overlaps with portions of Ferry, Okanogan, and Stevens Counties, which as a whole, are among the least densely populated counties in the State. In Okanogan and Stevens Counties, the largest population centers are outside of the North Half.

ORDER * 3

Article 6 of the 1891 Agreement reserved to the Tribe a perpetual right to hunt and fish on the North Half:

> It is stipulated and agreed that the lands to be allotted as aforesaid to said Indians and the improvements thereon shall not be subject, within the limitations prescribed by law, to taxation for any purpose, national, state or municipal; that said Indians shall enjoy without let or hindrance the right at all times freely to use water power and water courses belonging to or connected with the lands to be so allotted, and *that the right to hunt and fish in common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged*.

(Emphasis added.)   Congress ratified and approved the 1891 Agreement through a series of statutes enacted between 1892 and 1911.

The population and settlement of the State and mobility of individuals have increased exponentially since the 1891 Agreement. Today, a substantial portion of North Half lands are publicly owned, including national forest land, State-owned trust land managed by the Washington Department of Natural Resources, and two wildlife areas managed by the WDFW.

Both the State and the Tribe exercise their respective sovereign police powers and have enacted laws aimed at increasing hunter safety. The Tribe's Business Council is responsible for approving tribal hunting regulations that are proposed by the Tribe's Fish and Wildlife Department, which is responsible for the day-to-day management of natural resources and hunting, and coordinating with other federal, tribal, and State regulatory agencies.  The Tribe's Parks and Recreation Program has primary enforcement responsibility for hunting on the Colville Reservation.   The Tribe has a court system, including a trial and appellate court, to assist with the prosecution and defense of those charged with hunting violations.

ORDER * 4

1    The State also enacted hunting laws and has agents responsible for

2  enforcing such laws.  RCW 77.15.075.  WDFW currently has two enforcement

3  officers assigned to the North Half area.

4    Although the Tribe's[6] and the State's hunting laws are similar, they

5  are not identical:

| Tribe | State |
|---|---|
| –prohibits Tribal members hunting on the North Half from possessing a rifle or shotgun with a shell in the chamber in a motor vehicle, but permits shells in an attached magazine | –prohibits possession of a rifle or shotgun with a shell in either the chamber or an attached magazine in or on a motor vehicle, unless the hunter also possesses a disabled hunter's permit as provided by RCW 77.32.237 and complies with all rules of WDFW concerning hunting by people with disabilities, RCW 77.15.460(1), (4)(b) |
| –prohibits members from negligently shooting a firearm or a bow and arrow from, across, or along the maintained portion of any public highway in the North Half | –prohibits a person from negligently shooting a firearm from, across, or along the maintained portion of a public highway, RCW 77.15.460(2) |
| –prohibits hunting under the influence of intoxicating liquor or drugs | –prohibits hunting under the influence of intoxicating liquor or drugs, RCW 77.15.675(1) |
| –generally prohibits hunting outside of the period between one-half hour before sunrise and one-half hour after sunset except for black bear, cougar, bobcat, raccoon and skunk, which may be hunted at any time, including with the use of an artificial light of no more than 10,000 candlepower | –prohibits hunting for most species outside of the period between one-half hour before sunrise and one-half hour after sunset, WAC 232-12-289

–prohibits a person from hunting big game with the aid of a spotlight or other artificial light, RCW 77.15.450(1).  "Big game" includes elk, deer, moose, mountain goat, caribou, mountain |

[6]   The chart includes the Tribe's 2009-10 hunting season regulations.

ORDER * 5

| | sheep, pronghorn antelope, cougar, and bear,  RCW 77.08.030 |
|---|---|
| –recommends, but does not require, that members hunting on the North Half during the State's modern firearm hunting season for deer or elk wear a minimum of 400 square inches of florescent hunter orange exterior clothing | –requires hunters to wear at least 400 square inches of fluorescent hunter orange clothing when hunting deer or elk during the State's modern firearm season or when hunting certain other species when the same areas are open for modern firearm deer or elk season, WAC 232-12-055 |
| –authorizes only disabled hunters to shoot from within a motor vehicle and places restrictions on such hunting | –prohibits possession of a loaded firearm in or on a motor vehicle, RCW 77.15.460(1), implicitly making shooting from a vehicle unlawful.  State law does provide an exception for disabled hunters. RCW 77.15.460(4)(b);  WAC 232-12-828(5), (6) |

Mr. Johnson and the Tribe bring this lawsuit to obtain equitable relief preventing the State from applying its hunting laws to tribal members exercising their "in common" hunting rights.   Thereafter, the State filed a Motion to Dismiss Plaintiffs' § 1983 Claims (ECF No. 26) and the parties filed cross Motions for Partial Summary Judgment Re: Legal Standard (ECF Nos. 16 & 29).  On June 23, 2010, the Court heard oral argument on the motions.[7]  At the hearing, the Court inquired as to the impact of *Heck v. Humphrey* ("*Heck*"), 512 U.S. 477 (1994), on Mr. Johnson's 42 U.S.C. § 1983 claim; leave was given to file post-hearing briefs on this issue.  After reviewing the submitted material and relevant authority and hearing from counsel, the Court is fully informed.

---

[7]   The Tribe and Mr. Johnson, who was present, were represented by John Arum, Joshua Osborne-Klein, and Timothy Woolsey.  Joseph Shorin, III and Matthew Kernutt appeared the State's behalf.

ORDER * 6

As explained below, the Court dismisses the Tribe's § 1983 claim, allows Mr. Johnson to pursue his § 1983 claim, and sets forth the legal standard with which to assess the State hunting safety laws.

## II.  Defendants' Motion to Dismiss Plaintiffs' § 1983 Claims

The State seeks dismissal of Plaintiffs' 42 U.S.C. § 1983 claims on the grounds that 1) the Tribe a) is not a "person" as defined by § 1983 and b) may not maintain a § 1983 action as *parens patriae* for tribal members, and 2) Mr. Johnson may not bring a § 1983 action based on a communally-held hunting right.  Plaintiffs respond that the Tribe may bring a *parens patriae* § 1983 action on its members' behalf and that Mr. Johnson may pursue a § 1983 claim because the State violated his personally-held federally-recognized hunting right.  At the hearing, the Court raised the issue of whether, even if Mr. Johnson has standing to bring a § 1983 claim, his claim is barred by *Heck*.  As set forth below, the Court finds, while the Tribe may not pursue a § 1983 action, Mr. Johnson has standing to bring a § 1983 action and *Heck*'s favorable-termination rule does not apply.

## A.  Standard

A lawsuit is to be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it fails to state a claim for relief that is plausible on its face.  Fed. R. Civ. P. 12(b)(6) (2010).  "[A] complaint [that] pleads facts that are 'merely consistent with' a defendant's liability" fails to satisfy the "plausible" standard. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  In conducting its analysis, a court need not accept a plaintiff's legal conclusions as true, but must accept the alleged facts

as true and construe all inferences from them in the light most favorable to the plaintiff.  *Id.* at 1949-50.

**B.   Mr. Johnson**

Mr. Johnson seeks injunctive relief[8] under 42 U.S.C. § 1983[9] preventing the State from enforcing State hunting safety laws against him on the grounds that the State's citation and prosecution of these hunting offenses violate his "in common" hunting rights.  To maintain this § 1983 claim, Mr. Johnson must bypass two hurdles.  First, he must establish that he has standing to bring a § 1983 claim.  Second, he must show that *Heck*'s favorable-termination rule does not apply to his § 1983 claim.

1.   Standing

Relying upon *Skokomish Indian Tribe v. United States* ("*Skokomish*"), 410 F.3d 506 (9th Cir. 2005), the State argues that Mr. Johnson does not have standing to assert a § 1983 action for an alleged deprivation of the "in common" hunting right because a tribal member may not seek vindication under § 1983 for the deprivation of a *communal* tribal right.

────────────

[8]   Mr. Johnson and the Tribe also seek reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

[9]   Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other property proceeding for redress, . . . .

42 U.S.C. § 1983.

ORDER * 8

Mr. Johnson responds that *Skokomish* is not on point and instead relies on *Romero v. Kitsap County*, 931 F.2d 624, 626 (9th Cir. 1991).

In *Skokomish*, both the tribe and individual tribal members attempted to bring a § 1983 action against a city and a public utility for their actions in connection with the installation of dams, reservoirs, and other water projects, which flooded the reservation and caused substantial damage. In pertinent part, the Ninth Circuit stated:

> The Tribe's treaty-based rights do not give rise to individual actions cognizable under section 1983. As we stated in *Settler v. Lameer*, 507 F.2d 231, 237 (9th Cir. 1974), with regard to fishing rights similar to those that the Tribe's members assert here, "the fishing rights reserved in [the treaty] are communal rights of the Tribe, even though the individual members benefit from those rights." *See also Whitefoot v. United States*, 155 Ct.Cl. 127, 293 F.2d 658, 663 (1961) (noting that "interests in . . . fisheries are communal, subject to tribal regulation"). Because the Tribe's members seek to vindicate communal, rather than individual rights, they do not have cognizable section 1983 claims against the City or TPU.

*Id.* at 515-16 (nn.7-8 omitted). The language utilized by the Ninth Circuit in the body of its opinion is broad and appears to stand for the proposition asserted by the State: Mr. Johnson may not pursue his § 1983 action for violation of a treaty right. However, this broad language is limited by footnote eight, which states:

> In *Romero v. Kitsap County*, 931 F.2d 624 (9th Cir. 1991), we acknowledged that section 1983 claims for deprivations of treaty rights may be cognizable "under specified circumstances," *id.* at 627 n.5 (citing *Hoopa Valley* [*Tribe v. Nevins*], 881 F.2d [657,] 661-63 [9th Cir. 1989]), but we offered no additional insight into the issue. *Romero* itself was brought by, among others, individual tribal members who were arrested for gathering shellfish in areas they claimed were treaty-protected. The individuals brought suit under section 1983 against the officers who arrested them. This was a traditional section 1983 suit for unlawful arrest, clearly distinguishable from our case.

*Id.* at 516 n.8.

ORDER * 9

Here, state action was taken directly against Mr. Johnson: he was arrested and convicted of a state offense.  Accordingly, his § 1983 claim is akin to that in *Romero* and unlike the generic state action in *Skokomish*.  Therefore, the Court finds Mr. Johnson has standing to bring his § 1983 claim based on the alleged unlawful state citation and conviction in violation of the federally-secured treaty hunting right.[10] Defendants' motion is **denied in part**.

    2.   <u>*Heck*'s Favorable-Termination Rule</u>

Because Mr. Johnson has standing to pursue the § 1983 claim, the Court must determine whether Mr. Johnson, who received a deferred twelve-month sentence for possessing a rifle in a motor vehicle with a round in the magazine, is required to satisfy *Heck*'s favorable-termination rule in order to obtain the requested equitable relief.  As explained below, the Court determines the favorable-termination rule does not apply.

---

[10]  This ruling is also consistent with criminal law, wherein a criminal defendant may seek dismissal of the indictment on the grounds that the alleged offense violates a federally-secured treaty hunting and/or fishing right. *See United States v. Dion*, 476 U.S. 734, 735-36 (1986) (addressing defendant's argument that federal statutes violated a treaty-hunting right); *United States v. Williams*, 898 F.2d 727 (9th Cir. 1990) (allowing defendant to challenge state conviction on the grounds that it violated a treaty-hunting right). *See also United States v. Fox*, 573 F.3d 1050 (10th Cir. 2009) (rejecting government's argument that hunting right was not a right enjoyed by the tribal member but rather a treaty communal right).

ORDER * 10

The purpose of the favorable-termination rule is to harmonize the two main federal avenues of relief from state action: a petition for habeas corpus, 28 U.S.C. § 2254, and a complaint under the Civil Rights Act, 42 U.S.C. § 1983. *See Wilkinson v. Dotson*, 544 U.S. 74, 77-78 (2005). Habeas corpus is the province for challenges to the validity of any confinement or to particulars affecting its duration. *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973). A § 1983 action requests relief from state action that deprived one of a federal right. The favorable-termination rule was developed to ensure that an individual who is, or was, in custody pursues the stringent time requirements for habeas relief before filing a § 1983 action, *Huftile v. Miccio-Foncesco*, 410 F.3d 1136, 1137 (9th Cir. 2005). The favorable-termination rule, as developed by subsequent *Heck* cases, requires an individual who is, or was, in custody and is seeking relief that necessarily implies the invalidity of his conviction or sentence to establish that the conviction or sentence was already invalidated. *Id.* at 1139-40.

Here, Mr. Johnson was never "in custody" in connection with his misdemeanor conviction for unlawfully possessing a firearm in a vehicle. Mr. Johnson paid the imposed $100 fine, and it is undisputed that the deferred twelve-month sentence,[11] which required him to not commit further

---

[11] A deferred sentence was allowed for this misdemeanor offense pursuant to RCW 3.66.067. During the pendency of the deferral, Mr. Johnson's guilty plea could have been withdrawn and the charges dropped. However, there is no evidence that this occurred. Accordingly, Mr. Johnson's conviction stands.

ORDER * 11

hunting violations and to appear for a review hearing, has expired.  Mr. Johnson's freedom was never significantly confined or restrained. *Compare Jones v. Cunningham*, 371 U.S. 236 (1963) (finding that conditions imposed on a parolee were sufficient to constitute "in custody"), *with Henry v. Lungren*, 164 F.3d 1240, 1241-42 (9th Cir. 1999) (holding that an individual, who is required to register as a sex offender, is not "in custody"); *see also Dremann v. Francis*, 828 F.2d 6, 7 (9th Cir. 1987) (recognizing that a fine typically does not meet the "in custody" requirement).  Under these circumstances, the Court finds Mr. Johnson was never "in custody" and, therefore, the favorable-termination rule does not apply.  *See also Haddad v. California*, 64 F. Supp. 2d 930 (C.D. Cal. 1999) (holding that *Heck*'s favorable-termination rule did not apply because Haddad was not in custody as a result of his traffic conviction).

Because the favorable-termination rule does not apply and Mr. Johnson has standing to bring his § 1983 claim, the State's motion to dismiss Mr. Johnson's § 1983 claim is **denied**.

**C.   The Tribe**

The State also seeks dismissal of the Tribe's § 1983 claim, which seeks the same injunctive relief as Mr. Johnson but applicable to all tribal members.  The State relies on *Skokomish* and *Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701 (2003), to argue that the Tribe is not a "person" under § 1983 because it is vindicating a communal right held by the sovereign.  In response, the Tribe acknowledges that it is not a "person" under the circumstances but maintains that it may pursue a § 1983 action as *parens patriae*.  As explained below, the Court agrees with the State that the Tribe may not pursue this claim.

In *Inyo County*, the Supreme Court determined that a tribe could not pursue a § 1983 action challenging the county's actions to obtain tribal casino employment records.  538 U.S. at 711.  The Supreme Court ruled, "[q]ualification of a sovereign as a 'person' who may maintain a particular claim for relief depends not 'upon a bare analysis' of the word 'person,' but on the 'legislative environment' in which the word appears."  *Id.*  Because the tribe was advancing its *sovereign* right to withhold evidence relevant to a criminal investigation, the Supreme Court determined, under the circumstances before it, that the tribe was not a person as defined by § 1983.  *Id.* at 712.

Thereafter, the Ninth Circuit in *Skokomish* determined the tribe could not bring a § 1983 action to advance communal fishing rights because the tribe's ability to enter into the treaty with the federal government was a sovereign right.  In reaching this conclusion, the Ninth Circuit "[r]ecogniz[ed] that '[s]ection 1983 was designed to secure private rights against government encroachment,' as well as the 'longstanding interpretive presumption that "person" does not include the sovereign.'"  410 F.3d at 514-15.  *Cf. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Wisconsin* ("*Lac Courte Oreilles*"), 663 F. Supp. 682, 291 (W.D. Wis. 1987) (holding that the tribe was a "person" within the meaning of § 1983 when seeking vindication for the deprivation of a treaty-based usufructuary right[12]).

---

[12]  A usufructuary right is "the right to make a modest living by hunting and gathering off the land."  *United States v. Bresette*, 761 F. Supp. 658, 660 (D. Minn. 1991).

ORDER * 13

1    Under the circumstances of this case, the Tribe properly concedes

2  that it is not a "person" under § 1983 as defined by the Ninth Circuit.

3  The Court also concludes that the Tribe may not bring a § 1983 claim as

4  *parens patriae* as requested by the Plaintiffs.   "*Parens patriae* is a

5  doctrine whereby a sovereign . . . may in appropriate circumstances sue

6  as 'parent of the country' to vindicate interests of their citizens.

7  However, the entity purporting to advance the claim must be acting on

8  behalf of the collective interests of all its citizens." *Navajo Nation*

9  *v. Super. Ct. of the State of Wash. for Yakima County*, 47 F. Supp. 2d

10  1233, 1240 (E.D. Wash. 1999).   *See Alaska v. Native Vill. of Curyung*, 151

11  P.3d 388 (Alaska 2006) (allowing village to bring § 1983 action as *parens*

12  *patriae* to prevent future violations of the Adoption Act and the Indian

13  Child Welfare Act).   The Tribe is precluded from pursuing its *parens*

14  *patriae* claim because the Ninth Circuit in *Skokomish* ruled that

15  individual tribal members do not hold an interest in communal tribal

16  usufructuary rights.   There is no evidence in the record that the State

17  has cited tribal members other than Mr. Johnson for hunting offenses when

18  exercising their "in common" hunting rights.   Accordingly, tribal members

19  have not had state action taken against them for which the Tribe may

20  vindicate those interests as *parens patriae*.

21        **D.   Conclusion**

22        As explained above, the Tribe's § 1983 claim is dismissed, while Mr.

23  Johnston's § 1983 claim survives.   The State's motion to dismiss is

24  **granted and denied in part**.

25  *///*

26  *//*

ORDER * 14

**III.  Cross Motions for Partial Summary Judgment Re: Legal Standards**

Through their respective motions, the parties and the amici tribes[13] seek guidance as to what legal standard applies to determine whether the State's hunting-safety laws apply to tribal members exercising "in common" hunting rights on the North Half.  The Tribe[14] submits that state regulation of "in common" hunting rights should be permitted only if necessary for conservation purposes, but not for public health and safety

---

[13]  The amici tribes are the Tulalip Tribe, Muckleshoot Tribe, Port Gamble S'Klallam and Jamestown S'Klallam Tribes, Puyallup Tribe of Indians, Sauk-Suiattle Indian Tribe, Lower Elwha Klallam Tribe, Lummi Nation, Nisqually Indian Tribe, Swinomish Indian Tribal Community, Squaxin Island Tribe, Skokomish Indian Tribe, Stillaguamish Tribe of Indians, and Suquamish Indian Tribe.  The applicable treaties are the Treaty with the Quinault (Treaty of Olympia), July 1, 1855, 12 Stat. 971; Treaty of Point Elliott, Jan. 22, 1855, 12 Stat. 927; Treaty of Medicine Creek, Dec. 26, 1854, 10 Stat. 1132; Treaty with the Makah (Treaty of Neah Bay), Jan. 31, 1855, 12 Stat. 939; and Treaty of Point No Point, Jan. 26, 1855, 12 Stat. 933.  The amici tribes encourage the Court to adopt the Colville Tribe's position because 1) the State fails to recognize the unique federal, state, and tribal statuses and the relationships between these entities, and 2) the State's proposed "incidental effects" standard would impose a new requirement.

[14]  The Court refers to Plaintiffs and amici tribes collectively as "the Tribe" for purposes of the summary judgment motions.

ORDER * 15

purposes.[15]  If the Court allows the State to enforce public safety laws against tribal members exercising their "in common" hunting rights, the Tribe proposes that the State must show:

1)  the law does not discriminate against the Indian tribe;

2)  the law is required to prevent a demonstrable and imminent threat to public health or safety;

3)  the measure is appropriate to its purpose;

4)  existing tribal regulation or enforcement is inadequate to prevent the demonstrable and imminent threat to public health or safety; and

5)  adequate protection of public health and safety cannot be achieved to the full extent necessary by restricting hunting by nonmembers or by other less restrictive alternative means or methods.

The State counters that its laws that directly regulate the time, place, and manner of hunting must satisfy only the first three factors. And the State maintains that it need not establish any of these factors if its law 1) does not directly regulate the time, place, and manner of hunting, and 2) has no more than an incidental effect on the hunting right.

Over the past century, the Supreme Court and the Ninth Circuit have, on multiple occasions, elucidated the principles guiding analysis of sovereignty issues relating to treaty-reserved usufructory rights "in common with the citizens of the state" in Washington.[16]  *See United*

---

[15]  For simplicity purposes, the Court hereafter refers to "public health and safety" as simply "public safety."

[16]  History is critical to fully understanding Indian law principles:

Understanding history is crucial to understanding doctrinal developments in the field of Indian law. For example,

*States v. Winans*, 198 U.S. 371, 378 (1905) (holding that state license did not give Washington settler the right to exclude the Indian seeking to enjoy his "in common" fishing right); *Tulee v. Washington*, 315 U.S. 681, 684-85 (1942) (reversing tribal member's state conviction for catching a salmon without a state license because state statute was not "indispensable to the effectiveness of a state conservation program"); *Puyallup Tribe of Dep't of Game* ("*Puyallup I*"), 391 U.S. 392, 399 (1968) (allowing state "nondiscriminatory measures for conserving fish resources" subject to "in common" fishing right; *Dep't of Game v. Puyallup Tribe* ("*Puyallup II*"), 414 U.S. 44, 46-49 (1973) (invalidating state's net-fishing ban because it discriminated against Indians); *Antoine v. Washington*, 420 U.S. 194, 207 (1975) (defining "appropriate standards" in the context of state-conservation measures); *Washington v. Wash. Commercial Passenger Fishing Vessel Ass'n* ("*Fishing Vessel*"), 443

---

treaty-making with Indian tribes involved matters of immense scope:  The transactions totaled more than two billion acres, and some individual treaties dealt with land concessions involving tens of millions of acres. At the same time, treaties included minutiae such as provision of scissors, sugar, needles, and hoes. Yet, out of the felt needs of the parties to the treaty negotiations there evolved comprehensive principles that have continued significance to this day.  These include the sanctity of Indian title, the necessary preeminence of federal policy and action, the exclusion of state jurisdiction, the sovereign status of tribes, and the special trust relationship between Indian tribes and the United States. These principles endure beyond the four corners of negotiated treaties.  When Congress ended treaty-making in 1871, these principles lived on in the "treaty substitutes" that followed in the form of agreements, executive orders, and statutes. Thus, what is seemingly background becomes the foreground—indeed the basis—for contemporary judgments.

1-1 Cohen's Handbook of Federal Indian Law § 1.01.

U.S. 658, 682-83 (1979) (analyzing the district court's take allocation of particular fish between the state and the tribe); *United States v. Washington*, 520 F.2d 676, 685 (9th Cir. 1975) (analogizing "in common" treaty rights to a cotenancy).

Notably absent from the binding Supreme Court and Ninth Circuit cases dealing with state regulation of "in common" usufructuary rights is any reference to a state's exercise of its public-safety police power. While the parties cite to and rely upon non-binding district court and state appellate court decisions addressing the state public-safety issue, these cases are not binding precedent; further, they use slightly different terminology and address different issues.  *See Wisconsin v. Matthews*, 248 Wis. 2d 78 (Ct. App. 2001); *Mille Lacs Band of Chippewa Indians v. Minnesota*, 861 F. Supp. 784, 838-39 (D. Min. 1994); *Lac Courte Orielles*, 668 F. Supp. at 1235; *Wisconsin v. Whitebird*, 110 Wis. 2d 250 (Ct. App. 1982); *Wisconsin v. Gurnoe*, 53 Wis. 2d 390 (Sup. Ct. 1972). Therefore, the Court elects to focus on the principles announced in the binding precedents when developing the standards to apply to the State's hunting safety laws as applied to a tribal member  exercising "in common" hunting rights.

Before articulating these standards, the Court digresses to explain why a state has the authority to regulate "in common" hunting rights under appropriate standards for public-safety purposes.  The Supreme Court and Ninth Circuit have emphasized that neither treaty nor non-treaty individuals may destroy the exercise of the "in common" rights of the other individuals.[17]  *Fishing Vessel*, 443 U.S. at 669; *see also*

---

[17]  The same principles that underlie the protection of "in common"

*Kennedy v. Becker*, 241 U.S. 556, 563 (1916) (recognizing that neither the tribe nor the state may "destroy the subject," i.e., the fish over which they both enjoy the power to govern); *United States v. Washington*, 520 F.2d 676, 685 (9th Cir. 1975) ("[N]either the treaty Indians nor the state on behalf of its citizens may permit the subject matter of these treaties to be destroyed.  The state may interfere with the Indians' right to fish when necessary to prevent the destruction of a run of a particular species in a particular stream."). Although the Supreme Court and Ninth Circuit have focused on the *subject* of the "in common" treaty-fishing right at issue, i.e., the fish, the Court finds that this "non-destruction" principle extends to the *individual exercising* the "in common" right, i.e., the hunter or fisher.  This conclusion is supported by the Tribe's understanding when it entered the 1891 Agreement that neither tribal members nor state citizens could destroy each other's right to exercise the "in common" hunting right.  *See* E. Goodman, *Protecting Habitat for Off-Reservation Tribal Hunting and Fishing Rights: Tribal Comanagement as a Reserved Right*, 30 Envtl. L. 279, 309 & 320-24 (Spring 2000) (recognizing that tribes and states understood that they shared the right to manage the exercise of "in common" hunting and fishing rights).  Further, at that time, the Tribe would have recognized the State's a) indisputably strong interest in protecting its citizens through enforcement of safety laws, *see Kelley v. Johnson*, 425 U.S. 238, 247 (1976), and b) power to regulate conduct to ensure that every person

---

fishing rights apply to "in common" hunting rights.  *Antoine*, 391 U.S. at 207 (adding "and hunting" to *Puyallup I* quote).

ORDER * 19

uses "his property as not to injure his neighbors" and that "private interests" are "subservient to the general interests of the community," *Slaughter-House Cases v. Crescent City of Live-Stock Landing & Slaughter-House Co.*, 83 U.S. 36, 62 (1872).  Accordingly, it is clear the Tribe understood that the State has the police power to regulate "in common" hunting conduct by tribal members for public-safety purposes.

The Court now articulates the standards to be applied.  Using the Supreme Court's conservation-necessity standard as its guide,[18] the Court holds that a state may enact and enforce laws regulating a tribal member's exercise of an "in common" hunting right for public-safety purposes if the law('s):

    1)    reasonably prevents a public-safety threat;[19]

    2)    is necessary to prevent the identified public-safety threat;[20]

    3)    does not discriminate against Indians;[21] and

---

[18]  A state may enact and apply conservation laws to tribal members enjoying "in common" hunting and fishing rights if it is non-discriminatory, "is a reasonable and necessary conservation measure, and . . . its application to the Indians is necessary in the interest of conservation." *Antoine*, 420 U.S. at 207 (internal citations omitted).

[19]  *See Antoine*, 420 U.S. at 207.

[20]  *See id.; Tulee*, 315 U.S. at 684 (emphasizing that state-license requirement was not necessary because it was "not indispensable to the effectiveness of a state conservation program").

[21]  *See Antoine*, 420 U.S. at 207; *Puyallup II*, 414 U.S. at 46-47 (invalidating discriminatory state fishing ban); *Puyallup I*, 391 U.S. at

ORDER * 20

4)    application to the Tribe is necessary in the interest of public safety.[22]

The Court does not adopt either the Tribe's proposed a) "ineffective tribal self-regulation" factor or b) least-restrictive-alternative factor.[23]   As to the former, *Antoine*'s determination of "appropriate standards" did not include, either explicitly or inferentially, effective tribal self-regulation.   Nor did the Ninth Circuit do so in *United States v. Washington*, 520 F.2d at 686 n.4.   Although the Ninth Circuit did not remove the state-regulation stay imposed by U.S. District Court Judge George Boldt described as advancing "the Congressional policy of promoting tribal autonomy," that does not amount to adoption by the Ninth Circuit of "ineffective tribal self-regulation" as a factor for appropriate state regulation.   *Id.* (discussing *United States v. Washington*, 384 F. Supp. 312, 333 & 340-42 (W.D. Wash. 1974)).   Further, in 1891, the Tribe understood that it and the State co-managed "in common" wildlife and the individuals hunting the wildlife.   The non-adoption of an ineffective-tribal-self-regulation factor does not

---

399 ("The overriding police power of the State, expressed in *nondiscriminatory* measures for conserving fish resources, is preserved." (emphasis added)).

[22]   *See Antoine*, 420 U.S. at 207.

[23]   Nonetheless, the Court will compare state and tribal hunting-safety laws when assessing whether 1) the state law is necessary to prevent the identified public-safety threat and 2) the law's application to the Tribe is necessary in the interest of public safety.

ORDER * 21

negatively impact tribal self governance and ensures that the 1891 Agreement is interpreted as understood at the time of the agreement.

As to the latter factor (least-restrictive-alternative factor), there is no Supreme Court or Ninth Circuit precedent adopting such a factor when analyzing the appropriateness of state regulation of "in common" treaty rights.[24] Because there is no binding precedent to support the use of a least-restrictive-alternative factor, the Court elects not to adopt it.

The four public-safety standards set forth above apply regardless of whether the state law 1) does not directly regulate the time, place, and manner of hunting and 2) has no more than an incidental effect on the hunting right. The State proposed that, if the preceding two prongs were satisfied, the state law applied to an Indian exercising "in common" hunting rights notwithstanding the failure to satisfy appropriate non-

---

[24] While the Sixth Circuit did adopt such a factor, it offered no rationale for doing so. *United States v. Michigan*, 653 F.2d 277, 279 (6th Cir. 1981) (citing *Michigan v. LeBlanc*, 399 Mich. 31, 62 (Sup. Ct. 1976), for the least-restrictive-alternative factor; however, *LeBlanc* did not articulate a least-restrictive-alternative factor but rather utilized two "necessary" factors); *see also Lac Courte Oreilles,* 668 F. Supp. at 1236 (adopting a least-restrictive-alternative factor because the "state does not appear to contest this standard, and the least restrictive alternative does not appear incompatible with the reasonable and necessary test"). As such, the Sixth Circuit's decision is neither informative nor persuasive.

discriminatory public-safety standards.  The Court disagrees because the legal authority relied upon by the State is either inapplicable or contravenes U.S. Supreme Court treaty-interpretation principles.

The State relies on *United States v. Gallaher*, 275 F.3d 784 (9th Cir. 2001); *United States v. Fox*, 573 F.3d 1050 (10th Cir. 2009); and *Washington v. Olney*, 117 Wn. App. 524 (2003).  The Court finds *Gallaher* and *Fox* inapplicable because both cases involved *federal* prosecutions against tribal members relating to being a felon in possession of a firearm or ammunition.  The standard applied to assess whether a *federal* statute *abrogates* a treaty right is fundamentally different than the standard applied to assess whether a *state* may regulate an Indian's exercise of an "in common" treaty usufructuary right.  *See Menominee Tribe of Indians v. United States*, 391 U.S. 404, 411 n.12 (1968) (recognizing that a treaty is a "supreme law of the land" and therefore generally not subject to state regulation absent Congressional cessation); *Solis v. Matheson*, 563 F.3d 435, 437 (9th Cir. 2009) (setting forth general-applicability doctrine as it relates to a federal statute); *Oregon v. Jim*, 81 Or. App. 189, 191 (1986) (distinguishing between the federal government's authority to regulate Indian conduct with a state's more limited ability); L. Martin, K. Simmons, and E. Surette, 42 C.J.S. Indians: State Regulation: Off-Reservation Activity § 139 (2010) (recognizing that an Indian tribal member is subject to generally-applicable state laws regulating wildlife *unless* "in common" wildlife rights have been expressly reserved by the tribe).

Because *Olney* failed to appreciate the distinction between *federal* and *state* governments and their relationships with an Indian treaty,

ORDER * 23

*Olney* incorrectly relied on *Gallaher*.   117 Wn. App. at 530-31.
Therefore, *Onley*'s conclusion that the defendants failed to identify a
"specific treaty right exempting them from [state] laws of general
applicability off reservation boundaries" contravenes U.S. Supreme Court
treaty-interpretation principles.   *Id.* at 531.   For these reasons, the
Court declines to adopt the State's argument that appropriate, non-
discriminatory public-safety standards need not be used to assess the
lawfulness of all State hunting laws when applied to an Indian exercising
an "in common" hunting right.

## IV.   Conclusion

After careful consideration of binding Supreme Court and Ninth
Circuit decisions, the Court determines 1) Mr. Johnson may pursue his §
1983 claim, 2) the Tribe may not pursue its § 1983 claim, and 3) the
State may regulate "in common" hunting conduct of tribal members by
enactment and enforcement of laws that satisfy the public-safety
standards adopted herein by this Court.   Accordingly, for the reasons
given above, **IT IS HEREBY ORDERED:**

1.   Defendants' Motion to Dismiss Plaintiffs' § 1983 Claims **(ECF
No. 26)** is **GRANTED** (the Tribe) **and DENIED** (Mr. Johnson) **IN PART.**

2.   Plaintiffs' Motion for Partial Summary Judgment Re Legal
Standard **(ECF No. 16)** is **GRANTED AND DENIED IN PART.**

3.   Defendants' Motion for Partial Summary Judgment Re: Legal
Standard **(ECF No. 29)** is **GRANTED AND DENIED IN PART.**

4.   In order to regulate a tribal member's exercise of his "in
common" hunting rights for public-safety purposes, the State must
establish that its law('s):

ORDER * 24

1              a.    reasonably prevents a public-safety threat;

2              b.    is necessary to prevent the identified public-safety

3                  threat;

4              c.    does not discriminate against Indians; and

5              d.    application to the Tribe is necessary in the interest of

6                  public safety.

7     **IT IS SO ORDERED.**  The District Court Executive is directed to enter

8 this Order and forward a copy to counsel.

9     **DATED** this   3rd   day of January 2011.

10

11                         S/ Edward F. Shea

                                EDWARD F. SHEA

12                    United States District Judge

13

    Q:\Civil\2009\0342.short.dismiss.msj.12.29.edits.wpd

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER * 25